IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-4055-01-CR-C-BCW |
| | ) | |
| DOMINIC J. VEIT, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

On November 3, 2011, the Grand Jury returned a two-count indictment charging defendant Dominic J. Veit with possession and distribution of child pornography. Pending before the Court is Defendant's Motion to Suppress Statements (Doc. 57).[1] In his motion, Defendant argues that certain statements made by him in an interview with FBI agents during the execution of a search warrant at his residence on March 3, 2011, violated his privilege against self-incrimination and right to counsel under the Fifth Amendment. Defendant argues that the FBI agents should have given him Miranda warnings prior to his interview. Defendant also contends the agents failed to cease the interview after he invoked his right to counsel. In its response in opposition to Defendant's motion, the Government states that Defendant was never in custody to trigger protection under Miranda. The Government further argues that Defendant never made a clear and unequivocal request for counsel.

On August 14, 2014, the Court held a hearing on Defendant's motion to suppress and heard testimony from FBI Special Agent (SA) Mike Daniels, one of the two FBI agents who conducted the audio-recorded interview of Defendant. The testimony related to the events that occurred leading up to the interview as well as the circumstances surrounding the interview of Defendant on March 3, 2011.

## I. Factual Background

Upon receiving information that beginning on or about January 14, 2011, someone had obtained child pornography from an IP address located at the Defendant's residence, law

---

[1] This case was referred to the undersigned United States Magistrate Judge for processing in accord with the Magistrate Act, 28 U.S.C. § 636, and L.R. 72.1.

enforcement obtained a search warrant for the residence, which was located in Jefferson City, Missouri. The search warrant authorized a search of the residence and computers for evidence of child pornography. According to SA Daniels, FBI agents arrived at the home in the early morning of March 3, 2011. Defendant's parents were the only occupants of the residence when the agents arrived. SA Daniels testified that consistent with FBI protocol when executing a search warrant such as this, there were about eight to ten armed officers in uniform and equipped with bullet-proof vests at the residence. After making a sweep of the home and interviewing Defendant's parents, SA Daniels stated the agents learned Defendant lived in the basement of the residence and he was currently at work. The agents did not find child pornography when previewing the computer used by Defendant's parents. The computer used by Defendant's parents was located in the kitchen of the residence. Defendant's computer was located in another area of the house. According to SA Daniels, another agent called Defendant at work and requested his presence at the residence so they could talk to him. SA Daniels testified the agents did not go to Defendant's place of business because they did not want to embarrass Defendant if it turned out he was not responsible for the child pornography. Defendant voluntarily returned to the house following the phone call.

In describing the residence at the time Defendant arrived, SA Daniels stated that the residence was secured by the agents and that Defendant's parents were asked to stay within the living room area unless accompanied by an officer. The agents' firearms were holstered at all times. SA Daniels further testified that he and FBI Agent Enlow approached Defendant when he arrived at the residence and told him they wanted to talk with him. SA Daniels testified that he advised Defendant there were no charges filed, no one was going to be arrested on that day, and any statements he made were voluntary. SA Daniels further testified that when Defendant was asked if there was a location that would be more comfortable where they could talk, the decision to proceed to a sunroom off the main room was a joint decision made by SA Daniels, Agent Enlow, and Defendant.

Before the interview at issue began, SA Daniels testified that the three men proceeded to the sunroom separated from Defendant's parents and other officers still at the residence after a protective sweep by other agents was performed. As depicted in the photograph of Government's Exhibit 1, there is one entrance into the sunroom. A couch was positioned on one wall facing the interior of the room, where Defendant sat. SA Daniels sat facing Defendant in a
2

chair brought in from another room opposite one end of the couch that was closest to the entrance. SA Daniels testified that Agent Enlow stood facing Defendant opposite the end of the couch furthest from the entrance.

SA Daniels further testified that he placed a recording device in between himself and Defendant, who was seated on the couch. SA Daniels testified he did not advise Defendant of his Miranda rights because he did not consider Defendant to be in custody and he had advised Defendant any statements he made would be considered voluntary. He had further informed Defendant that he was not under arrest and would not be arrested that day even if he confessed. Near the beginning of the recorded interview, Defendant stated, "I don't really know whether I should be talking to you guys, I should probably talk to a lawyer". At this point, SA Daniels stated again to Defendant that any statements he chooses to make are voluntary and explained the benefits of cooperating with the agents at this stage. SA Daniels also testified that he made it clear to Defendant that if he wanted a lawyer, all questioning would cease.

The agents then resumed questioning the Defendant until he again made an indication that he was not sure whether he should be talking to an attorney. At this point, the agents repeated the benefits of cooperating and added that should he decide not to talk with them, Defendant's window to cooperate would no longer be available. Specifically, SA Daniels informed Defendant that it is his decision and stated, "you have every right . . . and it's totally up to you . . . to talk to an attorney." He repeated that it was the Defendant's decision and stated, "we'll make this last choice crystal clear . . . this is your thing . . . do you want to speak with an attorney before talking to us or do you want to talk to us . . . and if you want to talk to an attorney . . . we're done . . . your call, right now." Defendant then stated to the agents that he "may likely be making a big mistake", but continued to talk to the agents. After confirming that he wanted to continue speaking with the agents without the presence of an attorney, Defendant continued to talk and subsequently made incriminating statements to the agents. According to SA Daniels, Defendant never asked to leave the room during the course of the interview.

## II. Legal Analysis

### A. Custody

Defendant contends that his statements must be suppressed because he was not advised of his Miranda rights. Miranda v. Arizona, 384 U.S. 436 (1966), requires that a suspect be advised of certain rights, among them his right to remain silent and to have an attorney with him during

3

questioning. Law enforcement officers are required to advise a suspect of his Miranda rights only if custodial interrogation takes place. Id. Custody occurs either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way. Id. at 429.

In determining whether a suspect is "in custody" for the purposes of an analysis under Miranda, the Court examines the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a "reasonable person in the subject's position would have understood his situation" to be one of custody. Berkemer v. McCarty, 468 U.S. 420, 442 (1984). The totality of the circumstances are considered. United States v. Carter, 884 F.2d 368 (8th Cir. 1989).

The Eighth Circuit has outlined six factors to consider in determining whether a suspect is "in custody" for Miranda purposes:

> Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not under arrest; whether the suspect possessed unrestrained freedom of movement during the interview; whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; whether strong arm tactics or deceptive stratagems were employed during questioning; whether the atmosphere of the questioning was dominated by law enforcement officers; and whether the suspect was placed under arrest at the termination of the questioning.

United States v. Czichray, 378 F.3d 822, 831 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005). The affirmative presence of one or more of the first three factors mitigates the existence of custody at the time of the questioning. United States v. McKinney, 88 F.3d 551, 554 (8th Cir. 1996). The presence of one or more of the last three facts during questioning will tend to support finding of custody. Id. A finding of custody does not, however, have to be supported by all six factors. Id.

In applying the above facts to the facts of this case, the undersigned finds that Defendant was not "in custody" for the purposes of Miranda.

First, Defendant was informed at the beginning of the interview and later during the course of the interview that any statements he made would be considered voluntary. The Defendant was not under arrest. In fact, the agent informed Defendant that no one would be arrested that day. Defendant was also told by agents during the course of the interview that if he wanted to speak with an attorney, they would end the interview and leave. Finally, at the

4

conclusion of the interview in which Defendant made the alleged incriminating statements, he was not arrested. "We have long regarded these admonitions as weighty in the custody analysis. And we have never held that a person was in custody after receiving them." United States v. Perrin, 659 F.3d 718, 721 (8th Cir. 2011) (internal citation omitted). "The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990) (internal quotations omitted). Advice that a suspect is not under arrest, and that his participation in questioning is voluntary, is highly probative of whether a reasonable person would feel that he may terminate the interview and leave. Czichray, 378 F.3d at 826.

Second, there was no restraint of Defendant's movements in the sunroom during the interview. In fact, Defendant and the agents jointly agreed to use the sunroom for the interview in order to have privacy out of the hearing of Defendant's parents and the other agents conducting the search. Defendant sat on a couch alone during the interview at the end of the couch closest to the exit from the room. SA Daniels sat across from him in a chair. A second agent was standing at the end of the couch at a location that was the farthest from the exit from the room. Consequently, it does not appear that anyone was blocking the exit from the room. "When a person is questioned 'on his own turf,' . . . we have observed repeatedly that the surroundings are 'not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.'" Czichray, 378 F.3d at 826 quoting United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985) (internal citation omitted). Further, the conduct of the agents during the interview did not restrain the freedom of movement to the degree normally associated with a formal arrest. Defendant was not physically restrained or handcuffed. While the agents were armed as required by protocol during the execution of a search warrant, their weapons were holstered at all times. Cf. United States v. Axom, 289 F.3d 496, 501 (8th Cir. 2002) (concluding that suspect was not in custody even though agents escorted him to dress and use the bathroom and refused to let him get his own glass of water).

Third, Defendant was not at home when the agents arrived with the search warrant. When Defendant's parents informed the agents that he was at work, the agents called Defendant at his place of employment and asked him to come to the home. Defendant voluntarily returned home while the search was being conducted by the agents. When the agents asked Defendant if

5

he would agree to be interviewed, he agreed and even assisted the agents in the selection of the sunroom so they would have some privacy. Although Defendant clearly hesitated on a few occasions and wondered aloud if he should first speak with an attorney, Defendant was repeatedly informed that the interview was voluntary and that if he wanted to speak with an attorney, the interview would be terminated. Defendant voluntarily continued to speak with the agents even after the agents made these statements concerning his right to counsel and right to terminate the interview.

Fourth, during the interview, SA Daniels explained to Defendant the benefits of cooperating with the investigation. When Defendant expressed some concern about whether he should speak with an attorney first, SA Daniels informed Defendant that he would lose his opportunity to cooperate. However, SA Daniels repeatedly stated to Defendant that the interview was voluntary. While the loss of the opportunity to cooperate may have created some pressure on Defendant to continue speaking with the agents, the Court does not believe these statements rise to the level of strong arm tactics or deceptive strategems.

Fifth, during the interview in the sunroom there were only two agents present with Defendant. Defendant was seated alone on a couch. The agent conducting the interview was seated in a chair across from Defendant. A second agent was standing opposite Defendant at the end of the couch that was farthest away from the exit from the sunroom. The Court does not believe this was an unusually oppressive interview in which the agents dominated the conversation or unduly pressured Defendant into answering questions.

Sixth, as they had informed Defendant at the beginning of the interview, the agents did not place Defendant under arrest that day even after he made the alleged incriminating statements.

The "in custody" requirement is not satisfied merely because the person interviewed is the focus of criminal investigation. Beckwith v. United States, 425 U.S. 341 (1976). The "ultimate question in determining whether a person is in 'custody' for purposes of Miranda is 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" Czichray, 378 F.3d at 826 (8th Cir. 2004) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). To answer that question, we consider the totality of the circumstances that confronted the defendant at the time of questioning, and inquire whether a

6

reasonable person would have felt that he or she was free to terminate the interview and leave. Thompson v. Keohane, 516 U.S. 99, 112 (1995).

In a recent case involving facts similar to those here, the Eighth Circuit reversed a district court's suppression of statements and evidence gathered during the search of a residence and automobile. An excerpt of the relevant section discussing the facts in the case is provided here:

> Williams was charged with two counts of receipt and one count of possession of child pornography following a federal investigation into online purchasing of child pornography. Williams moved to suppress evidence found in searches of his home, car, and workplace, as well as statements he made to federal agents. After the hearing on the motion to suppress, the district court made findings of fact that neither party argues are clearly erroneous. We recount them before engaging in the relevant legal analysis.
>
> After Immigration and Customs Enforcement (ICE) agents identified Williams as a possible purchaser of child pornography, about seven armed and uniformed agents executed a search warrant at his home. When no one answered their knock, the agents used a battering ram to enter. Williams arrived at his home while the search was ongoing, and one of the agents showed him the search warrant and told him that the agents had found incriminating evidence.
>
> The agent asked Williams whether he would consent to speak with the agent and answer some questions. The agent told Williams that he was not under arrest, and that the decision whether to speak with law enforcement was voluntary. Williams agreed to speak with the agent and to answer questions.
>
> The agent sat with Williams in his living room, ten to fifteen feet from the door, and questioned him for thirty to forty-five minutes. The agent did not raise his voice, make any threats or promises, or use deception. Williams was not restrained during the interview, and the agent told him he could use the restroom or get a glass of water. At one point, Williams did leave the discussion to get water. Williams spoke clearly and appeared to understand what was happening in his interactions with the agents. At the end of the interview, Williams was not arrested.
>
> During the interview, Williams admitted to accessing child pornography websites from his home computer and work laptop, and told the officers that the laptop was in his car, which was parked outside. The agent asked for permission to search the car and recover the laptop. Williams asked the agent some questions and then signed a consent form for the search. Agents located Williams's work laptop in the car, seized the laptop, and later obtained a search warrant for the contents of that computer.

United States v. Williams, 2014 U.S. App. LEXIS 14159, at *1-3, 2014 WL 3685869, at *1 (8th Cir. July 25, 2014).

7

In Williams, the agents actually utilized a battering ram to enter the suspect's home and the Eighth Circuit did not find those facts compelling enough to make a finding that the subsequent interview of the suspect was unduly coercive. Id. Further, in Williams, there were seven armed and uniformed ICE agents. Id. Here, there were also several armed agents. Consequently, the Court concludes that the method employed by the agents here to gain Defendant's cooperation for the interview was not coercive in any manner. Clearly, subsequent statements made by Defendant were voluntarily made in a non-custodial setting.

Here, Defendant has failed to meet this burden. The factors discussed above support the conclusion that under the totality of the circumstances, Defendant was not in custody when he made his statement, and therefore, the agents were not required to give Miranda warnings.

**B.  Right to Counsel**

Defendant also contends that the FBI agents violated his constitutional rights under the Fifth Amendment to the United States Constitution and the rule of Edwards v. Arizona, 451 U.S. 477 (1981), by continuing to question him after he invoked his right to counsel. "When a suspect requests counsel during an interrogation, police must cease questioning until counsel has been made available or the suspect reinitiates communication with the police." United States v. Havlik, 710 F.3d 818, 821 (8th Cir. 2013). Defendant contends he told the agents on two separate occasions that he needed to speak with a lawyer. Defendant further contends the agents never ceased their questioning. Rather, the agents continued to persuade Defendant to speak with them.

Testimony from SA Daniels revealed that defendant hesitated near the beginning of the interview and stated, "I don't really know whether I should be talking to you guys. I should probably talk to a lawyer". SA Daniels then repeated again to Defendant that any statements he chose to make are considered voluntary. The agent then explained the benefits of cooperating with the agents at an early stage. The agent also testified he made it clear to Defendant that if he wanted a lawyer, all questioning would cease. Defendant continued to answer questions following this exchange.

The questioning continued until Defendant again hesitated and stated that he was not sure if he should be talking to an attorney. The agents repeated the benefits of cooperation and further added that if Defendant decided not to talk with the agents his window of cooperation would no longer be available. Specifically, SA Daniels stated, "You have every right . . . and it's

8

Case 2:11-cr-04055-BCW   Document 69   Filed 09/25/14   Page 8 of 10

totally up to you . . . to talk to an attorney." He repeated that it was Defendant's decision and stated, "We'll make this last choice crystal clear . . . this is your thing . . . do you want to speak with an attorney before talking to us or do you want to talk to us . . . and if you want to talk to an attorney . . . we're done . . . your call, right now." Defendant then stated to the agents that he "may likely making a big mistake", but nevertheless continued answering questions. After confirming that he wanted to continue speaking with the agents without the presence of an attorney, Defendant continued to talk. Defendant never asked to leave the room or the residence. Defendant subsequently made the alleged incriminating statements.

It is well settled that a Miranda Fifth Amendment right to counsel attaches only when a suspect invokes the right by making a clear and unequivocal request for counsel. Davis v. United States, 512 U.S. 452, 458-59 (1994). It is very clear on the audio tape of the interview that the Defendant never made a clear and unequivocal request for counsel. Although Defendant seemed to wonder aloud or hesitate on whether he should consult with an attorney, he clearly never made an unequivocal request for counsel. United States v. Kelly, 329 F.3d 624, 630 (8th Cir. 2003) ("we have consistently held that only a clear and unequivocal request for the assistance of counsel may serve to invoke a defendant's right"); e.g. Davis, 512 U.S. at 459 (defendant's statement of "[m]aybe I should talk to a lawyer" was insufficient to invoke the right to counsel); e.g. Henness v. Bagley, 644 F.3d 308, 319-320 (6th Cir. 2011) (no clear invocation of right to counsel when defendant said, " I think I need a lawyer"); e.g. Dormire v. Wilkinson, 249 F.3d 801, 805 (8th Cir. 2001) (holding on habeus review that it was not an unreasonable application of clearly established Supreme Court precedent for a state court to find the statement, "[c]ould I call my lawyer?" insufficient to invoke the right to counsel and mandate termination of questioning). Here, the Court finds Defendant's vague statements concerning whether he needed an attorney do not constitute a clear and unequivocal request for counsel and do not meet the requirements of Davis, supra. The Court finds the agents properly continued with the questioning during the interview in the sunroom.

### III. Conclusion

For the reasons set forth above, this Court finds that statements made during Defendant's audio-recorded interview are admissible. Defendant was not in custody and he did not clearly and unequivocally invoke his right to counsel. Defendant's statements were not obtained in violation of his constitutional rights under the Fifth Amendment.

9

Accordingly,

IT IS, THEREFORE, RECOMMENDED that Defendant's motion to suppress be DENIED. (Doc. 57).

Counsel are reminded they have fourteen (14) days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve exceptions by this date shall bar an attack on appeal of the factual findings in the Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

Dated this 25th day of September, 2014, at Jefferson City, Missouri.

/s/ *Matt J. Whitworth*
MATT J. WHITWORTH
United States Magistrate Judge